**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Abingdon Division**

| | |
|---|---|
| R.K.W., a minor,<br>by and through her NEXT FRIEND,<br>TIFFANY NGO, | )<br><br>) |
| Plaintiff, | ) |
| v. | )    Case No. 1:24-cv-00032-JPJ-JMS |
| WAHINGTON COUNTY, VA SHERIFF<br>BLAKE ANDIS, , | )    JURY TRIAL DEMANDED |
| and | ) |
| WAHINGTON COUNTY, VA DETECTIVE<br>WILLIAM SMARR, | ) |
| and | ) |
| MICHAEL CAREY, ADMINISTRATOR OF<br>THE ESTATE OF<br>AUSTIN LEE EDWARDS, deceased, | )<br><br>) |
| Defendants. | ) |

**FIRST AMENDED COMPLAINT**

COMES NOW Plaintiff, R.K.W., a minor, by and through her Next Friend, Tiffany Ngo,

by counsel, and for her Complaint against Defendants Sheriff Blake Andis, Detective William

Smarr, and Michael Carey, Administrator of the Estate of Austin Lee Edwards, deceased, states as

follows:

**PARTIES**

1.    Plaintiff R.K.W., born on January 25, 2007, R.K.W. sues by her Next Friend,

Tiffany Ngo, who resides in Richmond, Virginia.

2.      Defendant Sheriff Blake Andis ("Sheriff Andis") is the Sheriff of the Washington County Sheriff's Office.

3.      At all times relevant hereto, Defendant Detective William Smarr ("Detective Smarr") was a detective employed by the Washington County Sheriff's Department in Washington County, Virginia.

4.      Defendant Michael Carey is the Administrator of the Estate of Austin Lee Edwards ("Edwards"), deceased, having so qualified in the Circuit Court for the City of Richmond on December 14, 2023, pursuant to Va Code section 64.2-454.

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

6.      This Court has personal jurisdiction over Defendants because they are citizens of the Commonwealth of Virginia.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTS

8.      This case arises out of a horrific mass murder and abduction that occurred on November 25, 2022, in Riverside, California. The assailant, Austin Lee Edwards, deceased, used his position as a Deputy Sheriff with WCSO, including the indicia of state authority, to gain access to and murder three people and abduct a fourth in Riverside, California.

### *Catfishing*

9.      "Catfishing" is the process of luring a person into a relationship by means of a fictional online persona.  It was through this deceptive process that Austin Lee Edwards targeted R.K.W.

2

10.     At all times relevant herein, R.K.W. lived in Riverside, California in a single-family home (the "Winek Home") with her mother, Brooke Winek ("Brooke"); her sister, B.W.; her grandfather, Mark James Winek ("Mark"); and her grandmother, Sharon Ann Winek ("Sharon").

11.     In the summer of 2022, R.K.W. met Austin Edwards online through her Instagram account and began communicating with him on both Instagram and Discord.

12.     Edwards made these communications in Chesterfield and Richmond.

13.     Edwards told R.K.W. through their online communications that he was seventeen years old and that he would be turning eighteen on September 1, 2022.  In reality, Edwards was 28 years old.

14.     R.K.W. kept her online relationship with Edwards a secret from her family.

15.     Throughout the summer and early fall of 2022, Edwards and R.K.W. messaged and sent voice recordings to each other and became involved in an online relationship with each other. Edwards sent R.K.W. gifts, including jewelry; paid for her UberEats and Door Dash deliveries; sent her groceries, money and gift cards; and helped her buy birthday gifts for her friends.  Edwards told R.K.W. that he had a "good job."

### The Hiring of Austin Lee Edwards as a Washington County Deputy Sheriff

16.     The WCSO hired Edwards as a Patrol Deputy on November 16, 2022, ten days before he committed the crimes out of which this action arises.

17.     Before his employment with the WCSO, Edwards had been employed by the Virginia State Police ("VSP") as a trooper, having completed the Virginia State Police Academy in January 2022.  He resigned from the Virginia State Police in October 2022.

18.     Neither the VSP nor the WCSO performed an adequate background check on Edwards before hiring him.

3

19.     The investigator for the WCSO who reviewed Edwards's application to become a deputy sheriff, Detective Smarr, contacted the VSP for background information concerning Edwards.   Apparently, the VSP representative stated that he was not comfortable discussing Edwards's background.

20.     Upon information and belief, WCSO's non-discretionary policies and procedures, and state law Va. Code § 15.2-1705, prohibited WCSO from employing Edwards as a deputy sheriff until it received information from VSP and any other law-enforcement agency in Virginia that had previously employed Edwards, related to this job performance that led to his resignation.

21.     On his Background Investigation Report, Detective Smarr claimed to have conducted an FBI record check, and also checked the Central Criminal Records Exchange ("CCRE"); National Crime Information Center ("NCIC"); and the Virginia Criminal Information Network ("VCIN").

22.     Edwards listed three references on his application for employment with the WCSO. One of them was his father, and Detective Smarr failed to contact him.  Detective Smarr attempted to contact the other two references, but he never reached either of them and never followed up. Hence, Detective Smarr never spoke to any of the references Edwards listed other than his previous employer at Lowe's.  Detective Smarr attempted to contact Edwards's neighbors, but found no one at home. As with the personal references Edwards listed, Smarr never followed up with Edwards's neighbors.

23.     Upon information and belief, significant portions of Edwards's employment application were left blank. There was no response on the application with respect to whether Edwards had a weapons permit or if his permit had ever been revoked. There was no response to whether he had been convicted of a crime or whether he had ever been "questioned by law

4

enforcement" or "detained." There was no response to the question as to whether he had ever acted out in violence towards another person, physically or verbally; whether he had ever been the subject of a civil restraining order, protection order, or contact order.

24.    Upon information and belief, WCSO's non-discretionary policies and procedures required an applicant to provide responses to the questions on the application that asked whether the applicant had been convicted of a crime, whether the applicant had ever been questioned by law enforcement, or whether the applicant had ever been detained, before the applicant could be hired as a deputy.

25.    Upon information and belief, WCSO's non-discretionary policies and procedures required an applicant to provide responses to the questions on the application that asked whether the applicant had acted out in violence toward another person and whether the person had been the subject of a civil restraining order, protection order, or contact order, before the applicant could be hired as a deputy.

26.    Upon information and belief, WCSO's non-discretionary policies and procedures and Virginia law, Va. Code § 15.2-1705, required WCSO to perform an FBI record check, before hiring an applicant as a deputy.

27.    Upon information and belief, WCSO's non-discretionary policies and procedures required WCSO to check the NCIC, the VCIN, and the CCRE when considering whether to hire an applicant as a deputy.

28.    Upon information and belief, WCSO's non-discretionary policies and procedures and Virginia law, Va. Code § 19.2-389, prohibited WCSO from hiring an applicant as a deputy if the applicant was listed in the CCRE as being ineligible to possess a firearm.

5

29.     Detective Smarr concluded that Edwards was suitable for hire because he had no criminal history or civil issues, and employers spoke positively about him, as did his references. However, this overlooks the fact that Detective Smarr never spoke with the references provided, and the VSP never disclosed any information about Edwards.

30.     If the VSP or the WCSO had performed a background check on Edwards, neither of them would have hired Edwards.

31.     Detective Smarr's representation that he checked the CCRE for information on Edwards's background was false; if he had checked the CCRE, it would have revealed a 2016 incident in which Edwards was detained for psychiatric evaluation after threatening to kill his father and himself. Edwards was taken into custody after he cut his hand, and emergency medical technicians had to call police to help restrain him.

32.     Edwards was taken to a local hospital after the 2016 incident, where he was detained under an emergency custody order. Later the same day, a judge approved a temporary detention order and Edwards was transferred to a local psychiatric facility. During his stay at the psychiatric facility, a judge barred Edwards from possessing or transporting firearms. Edwards had been advised that his gun rights had been revoked unless restored by a court.

33.     The treatment order detailing the loss of Edwards' gun rights was sent to the CCRE by the clerk for the Bristol General District Court.

34.     Under Virginia law, any person who is held on a temporary detention order and is subsequently admitted to a treatment facility is prohibited from purchasing or possessing a firearm until and unless that right is restored by a court.

35.     Edwards never petitioned a court to restore his right to purchase or possess a firearm.

6

36.     At the time Edwards applied for a position with the WCSO, his right to purchase or possess a firearm had not been restored by a court. As such, it would have been unlawful for him to own or possess a firearm under Virginia law.

37.     If it had conducted a background check, WCSO also would have discovered that Edwards's right to own a gun was revoked as a result of the 2016 incident.

38.     Upon information and belief, WCSO's non-discretionary policies and procedures required WCSO to investigate whether an applicant had the legal right to possess a firearm before hiring the applicant as a deputy.

39.     Edwards also failed a polygraph exam administered by WCSO prior to being hired there.

40.     Upon information and belief, WCSO's non-discretionary policies and procedures required an applicant for employment as a deputy to pass the polygraph exam or for there to be a reasonable explanation as to why the applicant did not pass.

41.     Upon information and belief, pursuant to WCSO's non-discretionary policies and procedures and Virginia law, Va. Code § 15.2-1705, WCSO had the authority to require Edwards to undergo a psychological evaluation conducted under the supervision of a licensed psychiatrist or licensed clinical psychologist before employing the candidate as a deputy.

42.     Upon information and belief, Sheriff Andis, Detective Smarr, and WCSO did not require or even recommend that Edwards undergo a psychological evaluation before Edwards was hired as a deputy, or at any time.

43.     Upon information and belief, pursuant to WCSO's non-discretionary policies and procedures, Virginia law, Va. Code § 18.2-308.2:1, and federal law, 18 U.S.C. § 922, it was illegal for WCSO to give Edwards a firearm.

44.     A spokesperson for the VSP has admitted that the failure to perform a background check on Edwards was the result of "human error," and it would not have hired any officer candidate who it knew had been detained under an emergency custody order and a temporary detention order.

45.     When Edwards was hired as a deputy sheriff, the WCSO issued him a badge and a service revolver.  He would go on to use both the badge and the weapon to commit murder, arson, and kidnapping nine days later.

46.     After being hired, Edwards' supervisor became suspicious of him.

47.     Specifically, his supervisor(s) became suspicious of him having improper and illegal contact with minors over the phone.

48.     As such, his supervisor(s) requested to see his phone so they could investigate further. Edwards refused these requests, and his supervisors failed to take further action.

### Events Leading Up to and Including November 25, 2022

49.     R.K.W. broke off the online relationship with Edwards soon after Halloween of 2022 because Edwards had become "clingy" and "pushy" and wanted her to engage in activity of a sexual nature, including sending him naked photos of herself, with which R.K.W. was uncomfortable. R.K.W. blocked Edwards on Instagram, after which he emailed her a suicide note.

50.     In the interim between the break-up of their online relationship and Thanksgiving 2022, the WCSO hired Edwards as a deputy sheriff on November 16, 2022.  Edwards took time off from work beginning on Wednesday, November 23, 2022, and began a two-day driving trip from Virginia to California.

51.     On Thursday, November 24, 2022, Thanksgiving Day, R.K.W. went with her mother, Brooke; her sister, B.W.; and Brooke's boyfriend, Travis Thompson ("Thompson") to

8

Golden Corral for dinner.  They then stayed overnight at Thompson's apartment in Moreno Valley, California, where they stayed up late playing board games.

52.     At approximately 8:30 a.m. the following morning, November 25, 2022, R.K.W., B.W., and Brooke went to Starbucks in Brooke's car. They had plans to go shopping with Thompson that day, but as they returned to Thompson's apartment, Sharon, R.K.W.'s grandmother, called Brooke from the Winek Home. Sharon told Brooke to take her off the speaker phone because she needed to speak only to Brooke about something very serious.

53.     After Brooke's telephone conversation with Sharon ended, Brooke collected R.K.W. and B.W.'s cell phones and R.K.W.'s watch and told them that there was something wrong with their phones and they had to go the Winek Home to get their grandmother's card in order to fix them.  They returned to Thompson's apartment, delivered his coffee from Starbucks and then left Moreno Valley in Brooke's car.

54.     Edwards entered the Winek Home by falsely claiming that he was a law enforcement officer conducting an investigation. He showed Mark and Sharon his law enforcement badge and service firearm from WCSO.

55.     At approximately 9:42 a.m. on November 25, 2022, Sharon called Mychelle, Brooke's sister, from the Winek Home.  Sharon told Mychelle that there was a detective at the Winek Home, and that he was there conducting an investigation concerning R.K.W.'s exchange of lewd photographs with a peer.  During the conversation, Sharon spoke in hushed tones as if to prevent the "detective" from overhearing the conversation.  The "detective" grabbed the phone from Sharon and told Mychelle that Sharon was just distraught.

56.     Shortly thereafter, Brooke arrived at Mychelle's home.  Brooke dropped B.W. off with Mychelle and told Mychelle that she needed to go meet with her parents and the detective at the Winek Home.

57.     After dropping B.W. off at Mychelle's home, Brooke drove R.K.W. to the Winek Home.  Brooke turned off the car, put the keys in her purse, and told R.K.W. to wait in the car. After Brooke entered the house, R.K.W. noted that she did not see her mother's dog in the window, which was odd as the dog usually came to the window whenever people arrived, and she also noted that all of the windows in the house were closed, which was unusual.

58.     After waiting in the car for an extended period of time, R.K.W. decided to enter the Winek Home.  She opened the screen door and began to open the wooden entry door when a man she did not recognize pulled her by her hair into the house.  Her first thought was that it was the man who was there to fix the phones, which was the reason her mother told her that they needed to go to the Winek Home.

59.     Once she entered the house, R.K.W. saw Sharon in the entryway, Mark beyond Sharon near the stairs, and Brooke on the hardwood floor.  They were all lying face down with bags over their heads that were taped at the neck.  Their arms were bound behind them with duct tape, and their legs were taped together as well.  R.K.W. began to scream.

60.     The man who pulled R.K.W. into the house was Edwards, but R.K.W. did not immediately recognize him.  Edwards was wearing a police badge on his belt in the shape of a star. It was gold on the front and black on the back. As R.K.W. screamed, Edwards pointed a semi-automatic handgun with a star engraved on it at her.

61.     As Edwards spoke, R.K.W. recognized his voice from their cell phone conversations, and Edwards told her who he was.  He told her to stop screaming.  When she asked if he was going to hurt her, Edwards stated that he would not hurt her if she would stop screaming.

62.     Edwards grabbed R.K.W. and pulled her around the interior of the house with a gas canister that he used as he set fires in the rooms.  He opened the windows and doors of the house so that the fire would spread.  Edwards then took her outside and forced her into the back seat of his vehicle.

63.     Upon his arrival to the Winek Home, Edwards had parked his vehicle in a neighbor's driveway.  The neighbor had called the police about the suspicious vehicle in her driveway, but she called again after seeing Edwards force R.K.W. into his vehicle.

64.     Edwards then sped off from the Winek Home in his vehicle with R.K.W.  He told R.K.W. to pretend she was his daughter if anyone asked, that he was going to take her back to Virginia now that she has nothing in California, and he had to kill her family so he would be able to take her.

65.     Edwards told R.K.W. that he was a police officer, and that they "need to do better backgrounds".  Edwards also talked to her about what he learned in the police academy.  He took the badge off his belt as he drove.

66.     R.K.W. asked Edwards why he killed her family.  He told her that if he did not kill them, they would "report it" and he would not have enough time to escape California and return to Virginia. He also told R.K.W. that he had made Sharon call Brooke earlier that day.

67.     Edwards continued to drive, keeping his hand on the firearm.  He also had a large knife that was covered in blood. They stopped twice to use the bathroom at porta-potties.  He never let go of R.K.W.'s hand whenever they exited the vehicle.  They also stopped at one point so that

he could clean up the blood that was all over his body.  He told R.K.W. that they would not stop for food until they left California, and that their route would be through Las Vegas, New Mexico, and Texas.  He told her that she would have to stay in the back of the car until they got her a change of clothing.

68.    After Edwards abducted R.K.W., a neighbor noticed the house was on fire and called the police. When Riverside police and firefighters arrived on the scene, the house was engulfed in flames. A firefighter entered the home and found Sharon, Mark, and Brooke's bodies just inside the front door. All three were deceased.

69.    The Riverside police officers canvassed the area and conducted multiple interviews of neighbors, allowing them to track down Edwards based on the descriptions of his vehicle and video and photos from the neighbors' surveillance cameras.

70.    Police used a PING to trace Edwards and a pursuit ensued.

71.    Edwards told R.K.W. that if he was caught, he was going to kill himself.

72.    During the pursuit, Edwards began shooting the firearm through the back window of the vehicle. The vehicle filled with smoke.  Edwards had placed a large gas canister in the back seat with R.K.W., and the top had popped off and splashed her, and she feared that she would catch on fire.

73.    In the midst of the pursuit, Edwards's vehicle became stuck on rocks under a bridge and the police vehicles caught up to him. Edwards told R.K.W. that he was going to shoot himself and instructed her to get out of the vehicle, which she did.

74.    R.K.W. feared that the police would think that she was also "bad" and might shoot her, but she exited the vehicle and ran away from the scene.

75.     While engaged in a shootout with the San Bernadino County Sheriff's Department, Edwards shot and killed himself with the firearm, and the officers took R.K.W. into custody.

## CAUSES OF ACTION

### COUNT I – GROSS NEGLIGENCE AND GROSSLY NEGLIGENT HIRING
(Plaintiff v. Defendant Sheriff Blake Andis)

76.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs.

77.     Had Defendant Sheriff Andis reasonably investigated Edwards, he would have understood that the plainly obvious consequence of hiring Edwards, with his violent past, psychological issues, and suicidal ideations, would foreseeably lead to injury and/or death to others.

78.     Defendant Sheriff Andis was on actual or constructive notice of Edwards' psychological history, having asserted that his background was checked through the CCRE, NCIC, VCIN, and the FBI.

79.     Had Defendant Sheriff Andis properly screened Edwards before hiring him as a Sheriff's Deputy and not acted with the deliberate indifference in making his hiring decision, he would have discovered the February 2016 incident which rendered Edwards unfit and legally unable to buy or possess a firearm.

80.     Defendant Sheriff Andis' failure to conduct adequate background checks of Edwards violated WCSO's non-discretionary policies and procedures, and Virginia law Va. Code § 15.2-1705, Va. Code § 19.2-389, and other state and federal laws.

81.     Defendant Sheriff Andis violated WCSO's non-discretionary policies and procedures, and state law, Va. Code § 15.2-1705, when he did not receive the information from

Edwards' prior employer, VSP, regarding the job performance that led to his resignation, and yet hired Edwards as a deputy.

82.    Defendant Sheriff Andis violated WCSO's non-discretionary policies and procedures when he hired Edwards without requiring him to submit a complete application.

83.    Defendant Sheriff Andis wrongfully hired Edwards, providing him with a badge and service gun despite Edwards' known propensity for violence to others, psychological issues, and suicidal ideations.

84.    Defendant Sheriff Andis, in wrongfully hiring Edwards as a Deputy Sheriff, disregarded Edwards' known propensity for violence and causing injury to others.

85.    Upon information and belief, Defendant Sheriff Andis' conduct as set forth above violated and fell below standards established by written WCSO policies and procedures, state law, and federal law. As such, his negligence is not entitled to discretionary immunity.

86.    Defendant Sheriff Andis' conduct as set forth above was grossly negligent.

87.    Defendant Sheriff Andis' conduct constituted gross negligence because, under the circumstances, it represented a degree of negligence showing indifference, utter disregard, and lack of prudence amounting to a complete neglect of the danger Edwards could pose to the safety of others if he was armed and granted all of the status and powers of a police officer.

88.    As a direct and proximate result of Defendant Sheriff Andis' grossly negligent hiring of Edwards and issuing him a badge and service firearm, Plaintiff seeks the following damages:

        a.    Past, present, and future bodily injuries;

        b.    Past, present, and future physical pain;

        c.    Past, present, and future mental anguish;

14

d.     Past, present, and future inconvenience;

e.     Past, present, and future medical expenses;

f.     Past, present, and future lost earnings and lessening of earning capacity

g.     Personal, social, and financial limitations; and

h.     Other damages allowable at law.

## COUNT II – GROSSLY NEGLIGENT RETENTION
### (Plaintiff v. Defendant Sheriff Blake Andis)

89.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs.

90.     After having hired Edwards, Sheriff Andis failed to discover and take action with respect to Edwards' violent past, psychological issues, and suicidal ideations, which could foreseeably lead to injury and/or death to others.

91.     Defendant Sheriff Andis was on actual or constructive notice of Edwards' dangerous instability, because one or more complaints, concerns, and "red flags" regarding Edwards were raised by other WCSO personnel after Edwards was hired. Notwithstanding those complaints, concerns, and "red flags," Defendant Sheriff Andis failed to review the screening and background check of Edwards; failed to review the hiring decision; failed to investigate Edwards; psychological history, known for propensity for violence and suicidal ideations; failed to take action with respect to the legal prohibition on Edwards' possession of a firearm; and generally failed to take any action whatsoever to address the complaints, concerns, and "red flags" regarding Edwards that came to light after he was hired.

92.     Upon information and belief, Defendant Sheriff Andis' conduct as set forth above violated and fell below the standards established by written WCSO policies and procedures.

93.    Defendant Sheriff Andis' conduct constituted gross negligence because, under the circumstances, it represented a degree of negligence showing indifference, utter disregard, and lack of prudence amounting to a complete neglect of the danger Edwards could pose to the safety of others if he continued to be armed and granted all of the status and powers of a police officer.

94.    As a direct and proximate result of Defendant Sheriff Andis' grossly negligent retention of Edwards, Plaintiff's decedent suffered unconscionable bodily injuries, physical pain, and mental anguish.

95.    As a direct and proximate result of Defendant Sheriff Andis' grossly negligent retention of Edwards and issuing him a badge and service firearm, Plaintiff seeks the following damages:

       a.    Past, present, and future bodily injuries;

       b.    Past, present, and future physical pain;

       c.    Past, present, and future mental anguish;

       d.    Past, present, and future inconvenience;

       e.    Past, present, and future medical expenses;

       f.    Past, present, and future lost earnings and lessening of earning capacity

       g.    Personal, social, and financial limitations; and

       h.    Other damages allowable at law.

### COUNT III – GROSSLY NEGLIGENT ENTRUSTMENT
#### (Plaintiff v. Defendant Sheriff Blake Andis)

96.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs.

97.    Defendant Sheriff Andis knew, or in the exercise of reasonable care should have known, that Edwards was unfit to possess a service weapon.

98.     Defendant Sheriff Andis knew, or in the exercise of reasonable care should have known, that Edwards was unfit to possess a badge.

99.     Despite actual and constructive knowledge that Edwards was unfit to possess a gun and badge, Defendant Sheriff Andis issued a service weapon and a badge to Edwards, granting Edwards the status and powers of a police officer, and which Edwards used to gain access to the home and murder Plaintiff's decedent.

100.     Defendant Sheriff Andis' conduct constituted gross negligence because, under the circumstances, it represented a degree of negligence showing indifference, utter disregard, and lack of prudence amounting to a complete neglect of the danger Edwards could pose to the safety of others if he was armed and granted all of the status and powers of a police officer.

101.     As a direct and proximate result of Defendant Sheriff Andis' grossly negligent conduct as described above, Plaintiff's decedent suffered unconscionable bodily injuries, physical pain, and mental anguish.

102.     As a direct and proximate result of Defendant Sheriff Andis' grossly negligent entrustment of Edwards and issuing him a badge and service firearm, Plaintiff seeks the following damages:

       a.     Past, present, and future bodily injuries;

       b.     Past, present, and future physical pain;

       c.     Past, present, and future mental anguish;

       d.     Past, present, and future inconvenience;

       e.     Past, present, and future medical expenses;

       f.     Past, present, and future lost earnings and lessening of earning capacity

       g.     Personal, social, and financial limitations; and

h.      Other damages allowable at law.

## COUNT IV – GROSS NEGLIGENCE PER SE
### (Plaintiff v. Defendant Sheriff Blake Andis)

103.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs.

104.    At all times relevant to this action, hiring Edwards as a deputy and issuing a service weapon (including a firearm) and a badge to him were governed by Virginia law and federal law.

105.    At all times relevant to this action Va. Code § 15.2-1705, prohibited Edwards from being employed as a deputy sheriff until WCSO received information from Edwards' prior employer, VSP, related to his job performance that led to his resignation.

106.    At all times relevant to this action, Va. Code § 15.2-1705 required an FBI record check, and a check of the CCRE, before Edwards was hired as a deputy.

107.    At all times relevant to this action, Va. Code § 19.2-389 prohibited Edwards from being hired as a deputy if he was listed in the CCRE as being ineligible to possess a firearm.

108.    At all times relevant to this action, pursuant to Va. Code § 18.2-308.2:1 and 18 U.S.C. § 922, it was illegal to give Edwards a gun.

109.    Plaintiff is a member of the class of people for whose protection the aforementioned statutes were enacted.

110.    Defendant Sheriff Andis failed to comply with the aforementioned statutes.

111.    Defendant Sheriff Andis' conduct constituted gross negligence per se because, under the circumstances, it represented a degree of negligence showing indifference, utter disregard, and lack of prudence amounting to a complete neglect of the danger Edwards could pose to the safety of others if he was armed and granted all of the status and powers of a police officer.

112.    As a direct and proximate result of Defendant Sheriff Andis' gross negligence per se as described above, Plaintiff's decedent suffered unconscionable bodily injuries, physical pain, and mental anguish.

113.    As a direct and proximate result of Defendant Sheriff Andis' gross negligence per se, Plaintiff seeks the following damages:

a.    Past, present, and future bodily injuries;

b.    Past, present, and future physical pain;

c.    Past, present, and future mental anguish;

d.    Past, present, and future inconvenience;

e.    Past, present, and future medical expenses;

f.    Past, present, and future lost earnings and lessening of earning capacity

g.    Personal, social, and financial limitations; and

h.    Other damages allowable at law.

**COUNT V – VICARIOUS LIABILITY**
**(Plaintiff v. Defendant Sheriff Blake Andis)**

114.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs.

115.    At all times relevant to this action, Defendant Sheriff Andis, as the Sheriff of Washington County, employed Defendant Detective Smarr.

116.    At all times relevant to this action, Defendant Detective Smarr was operating within the course and scope of his employment with WCSO and for Defendant Sheriff Andis.

117.    Defendant Sheriff Andis is vicariously liable for the acts and omissions of his employees, including Defendant Detective Smarr.

118.    As a direct and proximate result of the wrongful actions described above, Plaintiff's

decedent suffered unconscionable bodily injuries, physical pain, and mental anguish.

119.    As a direct and proximate result of Defendant Sheriff Andis' conduct, Plaintiff

seeks the following damages for vicarious liability:

        a.      Past, present, and future bodily injuries;

        b.      Past, present, and future physical pain;

        c.      Past, present, and future mental anguish;

        d.      Past, present, and future inconvenience;

        e.      Past, present, and future medical expenses;

        f.      Past, present, and future lost earnings and lessening of earning capacity

        g.      Personal, social, and financial limitations; and

        h.      Other damages allowable at law.

## COUNT VI – GROSS NEGLIGENCE

### (Plaintiff v. Defendant Detective William Smarr)

120.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every

allegation asserted in the preceding and following paragraphs.

121.    Upon information and belief, Defendant Detective Smarr endorsed and approved

Edwards to be hired as a deputy with WCSO.

122.    As the investigator for the WCSO in charge of reviewing Edwards' employment

application to become deputy sheriff and conducting his background check, Defendant Detective

Smarr hired Edwards in a negligent and grossly negligent manner.

123.    Defendant Detective Smarr violated WCSO's non-discretionary policies and

procedures, and state law, Va. Code § 15.2-1705, when he did not receive the information from

Edwards' prior employer, VSP, regarding the job performance that led to his resignation, before recommending that WCSO hire Edwards as a deputy.

124.    Defendant Detective Smarr failed to make contact with the three references listed on Edwards's employment application. Defendant Detective Smarr chose not to speak with Edwards's father who knew about Edwards's violent past and psychological issues that would foreseeably lead to injury and/or death to others.

125.    Defendant Detective Smarr attempted to contact Edwards's neighbors but found no one at home so he decided to forego trying to reach them.

126.    Defendant Detective Smarr tortiously concluded that Edwards was suitable for hire despite not speaking with Edwards's references and overlooking various parts of Edwards's employment application that was left blank.

127.    In doing so, Defendant Detective Smarr violated WCSO's non-discretionary policies and procedures which required applicants to submit a complete application.

128.    Defendant Detective Smarr was on actual or constructive notice of Edwards' psychological history, having asserted that his background was checked through the CCRE, NCIC, VCIN, and the FBI.

129.    In making the decision that Edwards' was suitable for hire, Defendant Detective Smarr represented that he checked the CCRE for information on Edwards' background. However, had Defendant Detective Smarr checked the CCRE, he would have discovered Edwards' 2016 incident in which Edwards was detained for psychiatric evaluation after threatening to kill his father, himself, and had cut his hand. Edwards was not only detained under an emergency order but a judge also approved a temporary detention order to have Edwards transferred to a local psychiatric facility.

130.    Had Defendant Detective Smarr conducted a background check, he would have discovered that as a result of the serious nature of the 2016 incident, Edwards' right to own a gun had been revoked.

131.    Had Defendant Detective Smarr conducted an adequate background check, he would have understood that the plainly obvious consequence of hiring Edwards, with his violent past, psychological issues, and suicidal ideations, would foreseeable lead to injury and/or death to others.

132.    Defendant Detective Smarr's failure to conduct adequate background checks violated WSCO's non-discretionary policies and procedures and Virginia law, Va. Code § 15.2-1705, Va. Code § 19.2-389, and other state and federal laws.

133.    Defendant Detective Smarr wrongfully represented that Edwards was suitable for hire, thereby providing him with a badge and service gun despite Edwards' known propensity for violence to others, psychological issues, and suicidal ideations.

134.    Defendant Detective Smarr's conduct constituted gross negligence because, under the circumstances, it represented a degree of negligence showing indifference, utter disregard, and lack of prudence amounting to a complete neglect of the danger Edwards could pose to the safety of others if he was armed and granted all of the status and powers of a police officer.

135.    As a direct and proximate result of Detective Smarr's grossly negligent conduct as described above, Plaintiff's decedent suffered unconscionable bodily injuries, physical pain, and mental anguish.

136.    As a direct and proximate result of Defendant Detective Smarr's grossly negligent conduct described above, Plaintiff seeks the following damages:

      a.    Past, present, and future bodily injuries;

b.      Past, present, and future physical pain;

c.      Past, present, and future mental anguish;

d.      Past, present, and future inconvenience;

e.      Past, present, and future medical expenses;

f.      Past, present, and future lost earnings and lessening of earning capacity

g.      Personal, social, and financial limitations; and

h.      Other damages allowable at law.

### COUNT VII – GROSSLY NEGLIGENT ENTRUSTMENT
### (Plaintiff v. Defendant Detective William Smarr)

137.    Plaintiff hereby incorporates by reference, as it fully set forth herein, each and every allegation asserted in the preceding and following paragraphs.

138.    Defendant Detective Smarr knew, or in the exercise of reasonable care should have known, that Edwards was unfit to possess a service weapon.

139.    Defendant Detective Smarr knew, or in the exercise of reasonable care should have known, that Edwards was unfit to possess a badge.

140.    Despite actual and constructive knowledge that Edwards was unfit to possess a gun and a badge, Detective Smarr issued a service weapon and a badge to Edwards, which Edwards used to gain access to the home and murder Plaintiff's decedent.

141.    Defendant Detective Smarr's conduct constituted gross negligence because, under the circumstances, it represented a degree of negligence showing indifference, utter disregard, and lack of prudence amounting to a complete neglect of the danger Edwards could pose to the safety of others if he was armed and granted all of the status and powers of a police officer.

142.    As a direct and proximate result of Detective Smarr's negligent and grossly negligent conduct as described above, Plaintiff's decedent suffered unconscionable bodily injuries, physical pain, and mental anguish.

143.    As a direct and proximate result of Defendant Detective Smarr's grossly negligent conduct described above, Plaintiff seeks the following damages:

     a.    Past, present, and future bodily injuries;

     b.    Past, present, and future physical pain;

     c.    Past, present, and future mental anguish;

     d.    Past, present, and future inconvenience;

     e.    Past, present, and future medical expenses;

     f.    Past, present, and future lost earnings and lessening of earning capacity

     g.    Personal, social, and financial limitations; and

     h.    Other damages allowable at law.

**COUNT VIII – GROSS NEGLIGENCE PER SE**
**(Plaintiff v. Defendant Detective William Smarr)**

144.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs.

145.    At all times relevant to this actions, hiring Edwards as a deputy and issuing a service weapon and a badge to him were governed by Virginia law and federal law.

146.    At all times relevant to this action, Va. Code § 15.2-1705, prohibited Edwards from being employed as a deputy sheriff until WCSO received information from Edwards' prior employer, VSP, related to his job performance that let to his resignation.

147.    At all times relevant to this action, Va. Code § 15.2-1705 required an FBI record check, and a check of the CCRE, before Edwards was hired as a deputy.

148.    At all times relevant to this action, Va. Code § 19.2-389 prohibited Edwards from being hired as a deputy if he was listed in the CCRE as being ineligible to possess a firearm.

149.    At all times relevant to this action, pursuant to Va. Code § 18.2-308.2:1 and 18 U.S.C. § 922, it was illegal to give Edwards a gun.

150.    Plaintiff is a member of the class of people for whose protection the aforementioned statutes were enacted.

151.    Defendant Detective Smarr failed to comply with the aforementioned statutes.

152.    Defendant Detective Smarr's failure to comply with he aforementioned statutes constitute negligence per se.

153.    Defendant Detective Smarr's conduct constituted gross negligence per se because, under the circumstances, it represented a degree of negligence showing indifference, utter disregard, and lack of prudence amounting to a complete neglect of the danger Edwards could pose to the safety of others if he was armed and granted all of the status and powers of a police officer.

154.    As a direct and proximate result of Detective Smarr's negligence per se and gross negligence per se as described above, Plaintiff's decedent suffered unconscionable bodily injuries, physical pain, and mental anguish.

155.    As a direct and proximate result of Defendant Detective Smarr's grossly negligent conduct described above, Plaintiff seeks the following damages:

    a.    Past, present, and future bodily injuries;

    b.    Past, present, and future physical pain;

    c.    Past, present, and future mental anguish;

    d.    Past, present, and future inconvenience;

    e.    Past, present, and future medical expenses;

    f.     Past, present, and future lost earnings and lessening of earning capacity

    g.     Personal, social, and financial limitations; and

    h.     Other damages allowable at law.

## COUNT IX – VIOLATION OF 42 U.S.C. § 1983

### (Plaintiff v. Michael Carey, Administrator of the Estate of Austin Lee Edwards)

156.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs.

157.    At the time of Edwards' commission of the murders, arson, and abduction on November 25, 2022, Edwards was acting under color of state law, which includes acting under the pretense of law, as a sworn deputy sheriff employed by the WCSO.

158.    Under the Fourteenth Amendment to the United States Constitution, Edwards was prohibited from using his position as a deputy sheriff, including the indicia thereof, to violate the rights of substantive due process of any person.

159.    The foregoing actions of Edwards deprived Plaintiff's decedent of her rights secured under the Fourteenth Amendment of the United States Constitution, which provides that no State may "deprive any person of life, liberty, or property without due process of law."

160.    Edwards purported to act pursuant to his authority as a government official, i.e., a deputy sheriff, in order to gain access to and the trust of his victims at the Winek Home.

161.    Edwards actions have a sufficiently close nexus with the WCSO to be fairly treated as that of the State itself.

162.    In order to gain entry into his victims' home on November 25, 2022, outward indicia suggestive of state authority – including his badge, service revolver, and informing his victims that he was a detective – to give the impression that he was there on official government

26

business.   Furthermore, telling his victims that he was there to discuss illicit photographs sent by R.K.W. gave the indicia of governmental authority.

163.    Edwards' conduct occurred during the course of his performance of an apparent duty of office, and he could not have behaved in that way but for the authority provided to him by the office.

164.    Edwards would not have been able to obtain a firearm legally on his own, as his right to own a weapon had been revoked as a result of his conduct in 2016.

165.    The indicia of governmental authority provided to Edwards enabled Edwards to execute his scheme in a manner that private citizens never could have.

166.    Edwards carried out his scheme to gain vengeance against R.K.W. by invoking his police authority to carry it out by identifying himself as a detective or police officer who was there to discuss R.K.W.'s lewd photographs and using his Sheriff's badge and department-issued service revolver to gain access to the inside of the Winek Home where he murdered Brooke, Sharon, and Mark Winek.

167.    As a direct and proximate result of the foregoing acts, Plaintiff's decedent was murdered by Edwards.

168.    As a direct and proximate result of the wrongful acts of Defendant's decedent, Plaintiff sustained the following damages,

169.    As a direct and proximate result of the wrongful acts of Defendant's decedent, Plaintiff seeks the following damages:

      a.      Past, present, and future bodily injuries;

      b.      Past, present, and future physical pain;

      c.      Past, present, and future mental anguish;

d.    Past, present, and future inconvenience;

e.    Past, present, and future medical expenses;

f.    Past, present, and future lost earnings and lessening of earning capacity

g.    Personal, social, and financial limitations; and

h.    Other damages allowable at law.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff moves this Honorable Court for judgment against Defendants, jointly and severally, in the sum of FIFTY MILLION DOLLARS in compensatory damages, costs and interest allowable under Virginia law, and for such other relief this Court seems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby requests a trial by jury on all claims, defenses, and issues.

Dated:  October 8, 2025

Respectfully submitted,

/s/ Scott M. Perry
Scott M. Perry | VSB No. 67417
Nicholas J.N. Stamatis | VSB No. 95423
RAPOPORT SIMS PERRY
& VANOVERLOOP, P.C.
P.O. Box 5109
Arlington, Virgina 22205
P: (703) 291-6666
F: (703) 563-6692
sperry@rapoportlaw.com
nstamatis@rapoportlaw.com
*Counsel for Plaintiff*

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of October, 2025, a true and accurate copy of the

foregoing was filed via the CM/ECF system, thereby serving all counsel of record.

/s/ Scott M. Perry

Scott M. Perry